1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9
10

| | |
|---|---|
| CHRISTIAN POOLE, | CASE NO. 3:24-cv-05629-DGE |
| Plaintiff, | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 21) |
| v. | |
| CITY OF VANCOUVER et al., | |
| Defendant. | |

11
12
13
14
15

16          Before the Court is Defendants City of Vancouver and Officer Robert Block's motion for

17   summary judgment.  (Dkt. No. 21.)  Plaintiff Christian Poole opposes this motion.

18          The origins of this lawsuit lie in a fatal motor vehicle collision on the night of July 26,

19   2019.  Matthew Stevens was traveling westbound on a motorcycle on NE 18th Street in

20   Vancouver, Washington when he slammed into the driver's side door of Renee Unell's passenger

21   vehicle as she attempted a left turn to head eastbound on NE 18th Street.  Both Stevens and

22   Unell died on impact.  Plaintiff was traveling on a separate motorcycle with Stevens but was

23   behind when the collision occurred; he was forced to lay down his motorcycle and slide through

24

the debris.  Both Unell's and Stevens's vehicles sustained heavy damage and there was wreckage scattered along the road.  Plaintiff sustained an ankle injury and was found by officers standing west of the collision when they arrived.  He spoke with Officer Block about the events leading up to the crash.  He emphasized that he and Stevens, who were roommates, were perhaps speeding but were not racing and that they had drank a couple of beers at some point before the collision.  A field sobriety test and later blood draw at the hospital confirmed there was alcohol in Plaintiff's system.  One officer and a witness observed seeing two motorcycles driving at high speeds on NE 18th Street minutes before the accident.  Based on this evidence and his subsequent investigation, Officer Block prepared a probable cause affidavit and a formal investigative report with a recommendation of vehicular homicide charges for Plaintiff's involvement in the collision.

The Clark County prosecutor formally charged Plaintiff in November 2020.  During his state court criminal case, Plaintiff raised challenges to the probable cause finding, the admissibility of statements he made to the police, and the State's ability to prove all the elements of the crime he was charged with.  Ultimately, Plaintiff's case went to trial.  He was acquitted of all charges by a Clark County jury in December 2023.

This case is about the probable cause affidavit used to arrest and prosecute Plaintiff.  In this lawsuit, he claims that Officer Robert Block, who was the primary investigator into the cause of the fatal collision and the author of the probable cause affidavit, engaged in malicious prosecution, judicial deception, and deliberate fabrication of evidence.[1]  He also brings state law claims of negligence and outrage.  All five causes of action come back to an error in the probable

---

[1] Defendants note that Officer Block now holds the title of Corporal.  (Dkt. Nos. 21 at 4; 22 at 1.) Because he was an officer at all times relevant to this case, the Court will refer to him as such.

1  cause affidavit, which according to Plaintiff, misrepresents his involvement in the collision.

2  Plaintiff seeks damages for the alleged violations.  Defendants City of Vancouver and Officer

3  Block have moved for summary judgment, arguing that Plaintiff cannot prove the elements of his

4  claims.

5        In the course of the summary judgment briefing, Plaintiff has explicitly abandoned his

6  outrage claim (Dkt. No. 32 at 34) and though he opposes dismissal of his § 1983 claims against

7  Officer Block, he has offered no opposition to dismissal of his *Monell* claims against the City of

8  Vancouver.[2]  (*Id.* at 18–28.)  Thus, the remaining claims before the Court are malicious

9  prosecution under state law; § 1983 claims for malicious prosecution, judicial deception, and

10  fabrication of evidence against Officer Block; and negligence based on Officer Block's

11  investigation and/or preparation of the probable cause affidavit.

12        The Court will GRANT the summary judgment motion for multiple reasons.  First,

13  Plaintiff cannot show that the allegedly false statements or omissions he complains of in the

14  affidavit were either deliberate or demonstrate a reckless disregard for the truth.  Second, and

15  perhaps more importantly, even if the Court were to excise the contested statements from the

16  probable cause affidavit, there still would have been probable cause to arrest Plaintiff.  This

17  conclusion is fatal to both Plaintiff's claims for malicious prosecution and judicial deception.

18  The Court notes that the fact Plaintiff was ultimately acquitted of all criminal charges does not

19  negate the probable cause finding.  Additionally, Plaintiff cannot show that Officer Block

20  deliberately fabricated evidence that led to his prosecution.  And finally, even if Officer Block

21

22  [2] Because Plaintiff did not respond to Defendants' arguments in favor of granting summary
judgment to the city on the *Monell* claims, he has consequently abandoned these claims.  *See*

23  *Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) ("[Plaintiff] abandoned her
other two claims by not raising them in opposition to the County's motion for summary

24  judgment").

had a specific duty to Plaintiff in his investigation of the collision, he did not proximately cause Plaintiff's injury, and therefore Plaintiff's negligence claim fails.  The Court also briefly reviews Defendants' qualified immunity argument and finds it too supports the outcome.

## I    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Fatal Motor Vehicle Accident

At approximately 11:44 p.m. on the night of July 26, 2019, officers received a 911 call reporting a collision between two motorcycles and a car at the intersection of NE 18th Street and NE 187th Avenue in Vancouver, Washington.  (Dkt. No. 22 at 8.)  NE 18th Street is a two-lane street running east to west, and NE 187th Avenue runs north to south, ending at a "T" intersection with NE 18th Street on its north end.  (*Id.* at 8–9.)  There are homes and driveways along the north side of NE 18th Street, and the south side contains empty gravel lots, a dog park, and a soccer field.  (*Id.* at 8.)  On the night of the accident, Stevens was driving a white Kawasaki Ninja ZX1000 motorcycle westbound on NE 18th Street.  (*Id.*)  Plaintiff was driving a green Kawasaki Ninja ZX600 motorcycle and was following Stevens.  (*Id.*)  Unell was attempting a lefthand turn from NE 187th Avenue onto eastbound NE 18th Street in a BMW X5 SUV.  (*Id.*)  The accident occurred when Stevens collided with the driver's side door of Unell's vehicle.  (*Id.*)

Responding officers described a violent and chaotic situation.  Both Unell and Stevens were pronounced dead at the scene by paramedics.  (Dkt. No. 25 at 4.)  In his incident report, Officer Jason Calhoun observed "portions of a totally destroyed motorcycle" near the intersection and "heavy damage to the driver side door" of the BMW.  (*Id.*)  He also noticed a motorcyclist was laying on his back and was not moving or breathing and "appeared deceased." (*Id.*)  The driver in the BMW was "leaning/slumped over toward the passenger seat" and was

1    also not moving.  (*Id.*)  Witnesses John and Ruth Pfeiffer told Officer Calhoun they observed the

2    collision scene shortly after the accident and saw a young child, around eight or nine years old,

3    running along the edge of the road and "screaming/crying hysterically saying her mom was

4    hurt."  (*Id.*)

5          Officer Christopher Douville recalled "a situation of considerable confusion and chaos."

6    (Dkt. No. 27 at 4.)  When he arrived on the scene, he noticed a motorcyclist (later identified as

7    Plaintiff) was conscious and standing next to a green motorcycle laying on its side.  He

8    "appeared unsteady on his feet" and his eyes were wide with "what [Officer Douville] initially

9    took to be shock."  (*Id.*)  Officer Douville asked if Plaintiff was okay; Plaintiff told Officer

10   Douville, "'I think so.'"  (*Id.*)  Officer Douville told him to sit on the north curb of NE 18th

11   Street and eventually directed another officer to wait with him.  (*Id.*)  Officer Douville noticed a

12   light-colored motorcycle was "nearly in pieces as it was strewn across the roadway" and "nearly

13   the entire driver's side door" of the BMW was caved in. (Dkt. No. 27 at 4.)  He spoke with

14   several other bystanders who did not witness the crash but happened upon it soon afterward and

15   were trying to help by blocking traffic on NE 18th Street.  (*Id.*)

16         Upon investigating the scene, Officer Sean Donaldson noticed "catastrophic" damage to

17   the driver's side of the BMW.  (Dkt. No. 28 at 4.)  He saw Stevens's body lying on the ground

18   behind the BMW, "contorted in an unnatural position."  (*Id.*)  He observed the front handlebars,

19   wheel, and fork had been ripped from the body of Stevens's motorcycle, and "hundreds of small

20   plastic, metal, and glass parts" were scattered throughout the scene.  (*Id.*)  He concluded,

21   "[b]ased on the damage to Matthew's motorcycle and the significant damage to the driver's side

22   of Renee's vehicle, I believed this was a high speed collision."  (*Id.*)

23

24

1      Other witnesses indicated speed was a factor in the crash.  Modesto Garza, a resident

2  whose home was near the collision site, told Officer Douville he had been in his residence that

3  night and "for about an hour prior to the collision" he heard "two street motorcycles racing up

4  and down NE 18th Street." (Dkt. No. 27 at 4.)  Officer Calhoun noted in his report that "[j]ust

5  about 5 minutes prior" to the 911 call, he was leaving another call "a few blocks south" of NE

6  18th Street when two motorcycles went "racing past," heading east on NE 18th Street at "easily

7  100+ MPH." (Dkt. No. 25 at 4.)  Officer Calhoun was unable to "get a good look at the bikes or

8  the riders" because of their speed and the traffic in front of him, but he did notice that they were

9  "sport-bike types of motorcycles" and one of them was green. (*Id.*)

10      Plaintiff sustained minor injuries in the accident and was eventually tended to by medical

11  personnel for an injury on his right ankle. (Dkt. No. 27 at 5.)  Because of the injury, Plaintiff sat

12  on the curb to speak with Officer Robert Block, the primary investigator.  (*Id.*)  Officer Douville

13  stood about three feet away and noticed the "odor of intoxicants emanating from" Plaintiff as he

14  spoke. (*Id.*)  Officer Paul Whalen "observed [Plaintiff] burp several times" and could smell "the

15  odor of an alcoholic beverage" (Dkt. No. 26 at 4); Officer Block also noticed the smell of

16  intoxicants on Plaintiff's breath and saw that Plaintiff's eyes were "bloodshot and watery." (Dkt.

17  No. 24 at 45.)  Officer Block added Plaintiff "seemed to look past [him]" and was slow to

18  respond to questions.  (*Id.*)

19      While still sitting at the scene, Plaintiff described to Officer Block the events leading up

20  to the collision.  (*Id.* at 46.)  He and Stevens, who were roommates, were at another friend's

21  house and Plaintiff consumed two cans of beers there.  (*Id.*)  He did not provide a timeline of

22  when they were drinking but stated they were "drinking beer earlier in the day as well." (*Id.*)

23  Plaintiff thought Stevens had more to drink than he did.  (*Id.*)  Plaintiff explained he and Stevens

24

left the friend's house together and decided to ride motorcycles before heading back to their home.  (*Id.*)  Plaintiff told Officer Block that Stevens was ahead of Plaintiff at the time of the collision.  (*Id.*)  Plaintiff described the collision as "'an explosion of parts' in front of him"; he avoided what debris he could but was ultimately forced to fall to the side of the motorcycle, where he slid on the pavement to where he was located at the time the officers arrived on scene. (*Id.*)  Plaintiff estimated his speed prior to the collision was about 60 miles per hour, but that Stevens was ahead of him and was going faster than Plaintiff.  (*Id.*)  He denied they were racing. (*Id.*)

Officer Block asked if Plaintiff would be willing to submit to a field sobriety test. (*Id.*) Plaintiff agreed and Officer Block performed a Horizontal Gaze Nystagmus test (HGN) and a Preliminary Breath Test (PBT).  (*Id.* at 46–47.)  Plaintiff's PTB sample was 0.086 at approximately 12:30 a.m. on July 27.  (*Id.* at 47.)

At this point, an ambulance arrived to transport Plaintiff to the hospital to treat his ankle injury.  (*Id.*)  Officer Block advised Plaintiff he was being detained for "further DUI processing." (*Id.*)  Officer Jeffrey Anaya followed the ambulance to the hospital and Officer Block authored a search warrant for a blood draw; the warrant was granted over the phone by Clark County District Judge C. Sleight.  (*Id.*; Dkt. Nos. 22 at 20–21; 30 at 4.)  At approximately 2:23 a.m., Officer Anaya read Plaintiff his *Miranda* warnings and Plaintiff signed an attestation waiving his rights.  (Dkt. No. 30 at 4, 12–13.)

During his conversation with Officer Anaya at the hospital, Plaintiff again reiterated he was not racing with Stevens and stated he was "more than a quarter mile behind him" when the collision occurred.  (*Id.* at 4.)  Officer Anaya told Plaintiff he had received "vague information" that Plaintiff and Stevens had been seen driving "at high rates of speed in that area for a long

period of time." (*Id.*)  Plaintiff responded he and Stevens "were not traveling very fast." (*Id.*)

Officer Anaya informed Plaintiff both Stevens and Unell died at the scene; Plaintiff was "visibly

shocked" at the news. (*Id.*)  Plaintiff still "appeared to be in shock from the incident and his

demeanor would range from calm to distraught," and while Plaintiff was unable to provide

specific details about the accident, Officer Anaya recalled "this appeared to be more from shock

and trauma than him being untruthful." (*Id.*)  Finally, the blood draw pursuant to the warrant

was performed at 2:35 a.m. (*Id.*)  Plaintiff's clothes were collected and entered into evidence.

(*Id.*)

## B. Subsequent Investigation

Two days after the accident, Officer Block returned to the scene to take photos of the

roadway and surrounding areas. (Dkt. No. 22 at 11.)  He noticed the "limited visibility" on the

north side of NE 18th Street and predicted that someone attempting to turn onto the street from

NE 187th Avenue would have to go several feet past the stop sign to see whether they could

safely make the turn. (*Id.*)  On August 15, Officer Block retrieved Unell's phone from the

evidence unit and met with Unell's family. (*Id.* at 12.)  He confirmed that at the time of the

collision, Unell was not looking at an app on her phone, nor did it appear she had made a phone

call "during or in close proximity prior to the collision." (*Id.*)  On August 20, Officer Block

spoke with Unell's friend Mariela Singhose, whose home Unell and her daughter were leaving

on the night of the accident. (*Id.*)

Also on August 20, Officer Block spoke with Shane Gardner, the Director of Safety and

Security for Evergreen Public Schools. (*Id.*)  Gardner allowed Officer Block to review the

security cameras at Evergreen High School, located approximately 2.55 miles from the collision

site. (*Id.* at 4, 12.)  The video captured a video of two motorcycles driving eastbound on NE

18th Street "at what appeared to be a high rate of speed" at approximately 11:37 p.m. on the night of July 29.  (*Id.* at 12.)  Officer Block went to the school to measure the length of the street and the distances between three signposts on the street.  (*Id.*)  He then conducted a "time/distance equation" to "gain a comparable speed analysis" and estimated the motorcycles were traveling 103–104 miles per hour when they were captured on video.  (*Id.*)  Though Officer Block found it was "unlikely" the motorcycles were traveling at a constant speed of 100 miles per hour, he deduced that a motorcycle traveling at that speed would take 86 seconds to travel from Evergreen High School to where NE 18th Street turns into NE 192nd Avenue (approximately 0.15 miles from the crash site).  (*Id.* at 4.)  Officer Block concluded this speed analysis corroborated Officer Calhoun's observation of two motorcycles speeding at 100 miles per hour on NE 18th Street before the collision.  (*Id.* at 13.)

Officer Block examined all three vehicles at the Vancouver Police Department evidence lot.[3]  (*Id.*)  He again observed the "catastrophic contact damage" on the driver's side of Unell's BMW.  (*Id.*)  He noted Stevens's motorcycle was "completely destroyed due to the force of the impact," with several points where the metal frame was torn apart, "indicating this was a significant impact."  (*Id.*)  By contrast, he again observed the motorcycle ridden by Plaintiff had "'road rash'"-type damage "consistent with the motorcycle sliding on its side on the pavement."  (*Id.* at 14.)

On November 14, Officer Block received autopsy and toxicology reports for Stevens and Unell.  (*Id.*)  Stevens's toxicology report showed his blood alcohol level at 0.026g/100mL.  (*Id.*)  Unell's toxicology report showed no impairing substances in her blood sample.  (*Id.*)  Plaintiff's

---

[3] The vehicle examination of the motorcycle ridden by Plaintiff was conducted at approximately 12:27 p.m. on August 22, 2019, pursuant to a search warrant granted by Clark County District Court Judge Parcher.  (Dkt. No. 22 at 13.)

toxicology report came back on March 6, 2020, with a blood alcohol content reading of 0.052g/100mL.  (*Id.* at 22.)

### C.  The Probable Cause Affidavit

On July 14, 2020, Officer Block prepared a formal report summarizing the entire investigation up until that point.[4]  (*See* Dkt. No. 22 at 8–15.)  On July 15, he prepared a probable cause affidavit.  (*See* Dkt. No. 24 at 24–25.)  In support of charges of vehicular homicide under Washington Revised Code § 46.61.520, Officer Block presented the following evidence in his probable cause affidavit:

- The motorcycle driven by Stevens was "unrecognizable due to its damage";

- The initial inspection of the scene showed that the two motorcycles were westbound on NE 18th Street at a "high rate of speed";

- The BMW was southbound on NE 187th Avenue making a left turn onto eastbound NE 18th Street.  Then, "[t]he first motorcycle collided with the BMW at the driver's door, and the second motorcycle collied with both vehicles";

- Both Unell and Stevens were declared deceased at the scene;

- Officer Block spoke with witnesses who reported "the two motorcycles had been racing back and forth on NE 18th Street" and "the motorcycles had been driving at high speeds in each direction several times";

- When he spoke with Plaintiff following the accident, Plaintiff "admitted to drinking beer with the deceased motorcycle driver, Matthew, throughout the day," and Officer Block noticed the smell of alcohol emitting from Plaintiff;

---

[4] Officer Block's formal investigative report adopts much of the language from his initial incident report from August 8, 2019.  (Dkt. Nos. 22 at 8–15; 24 at 43–49.)  Neither of those reports include the error discussed *infra*.

- Plaintiff estimated his speed at about 60 miles per hour before the accident;

- When asked if Plaintiff and Stevens were racing, Plaintiff told Officer Block "'we were probably speeding but we were not racing each other'";

- Plaintiff took a HGN test and Officer Block observed "4 of 6 clues present" in Plaintiff's eyes;

- At 12:30 a.m., while still at the scene, Plaintiff provided a breath sample of 0.086 into a PBT instrument; and

- A blood draw that contained 0.052 grams of alcohol per 100mL of blood was performed at the hospital pursuant to a search warrant.

(*Id.*)  Officer Block concluded, "[b]ased on [Plaintiff]'s reckless driving, driving under the influence and being involved in a collision where a death occurred, probable cause was developed to charge [Plaintiff] with Vehicular Homicide."[5]  (*Id.* at 25.)

The probable cause affidavit contained an incorrect statement upon which this case hinges.  Officer Block wrote,

> The initial inspection of the scene showed that the two motorcycles were westbound on NE 18th Street at a high rate of speed.  The BMW was southbound on NE 187th Avenue making a left turn onto eastbound NE 198th Street.  The first motorcycle collided with the BMW at the driver's door, and *the second motorcycle collied with both vehicles*.[6]

---

[5] Defendants attribute the prolonged period between the accident and the initiation of criminal proceedings to the delay in obtaining the toxicology results (*see* Dkt. No. 22 at 6, 22) and the onset of the COVID-19 pandemic.  (Dkt. No. 21 at 8, n.3.)

[6] The parties do not dispute that Officer Block acknowledged this was a mistake.  On September 30, 2021, Officer Block was interviewed by Plaintiff's defense counsel, and they discussed the error at length.  When asked specifically about how the error was made, Officer Block responded, "I believe it's supposed to be parts, like vehicle parts. . . . I think [Plaintiff] said it was an explosion of parts in front of him.  He went through this explosion of parts, and that's when he laid the motorcycle down."  (Dkt. No. 24 at 13.)  He reiterated, "Yes, just the debris.  He did not hit the actual motorcycle or the BMW."  (*Id.* at 14.)

1   (*Id.* at 24) (emphasis added).  The formal investigative report, which contained additional details

2   about the collision, the aftermath, and Officer Block's investigation, as well as all the responding

3   officers' reports, were presented to the prosecutor along with the probable cause affidavit "prior

4   to charges being filed in October 2020."  (Dkt. No. 22 at 6.)

5   ### D.  Plaintiff's Criminal Case

6       Clark County Prosecuting Attorney Anna Klein filed charges against Plaintiff on October

7   21, 2020.  (Dkt. No. 24 at 19–20.)  The charges included two counts of vehicular homicide under

8   Washington Revised Code § 46.61.520(1)(b) for "operating vehicle in a reckless manner" and

9   two counts of vehicular homicide under Washington Revised Code § 46.61.520(1)(a) for

10  "operating vehicle while under the influence."  (*Id.*)  The probable cause affidavit prepared by

11  Officer Block formed the basis for the charges.  (*Id.* at 22.)  A criminal summons was issued and

12  Plaintiff's arraignment was scheduled for Thursday, November 12, 2020.  (*Id.* at 27.)  On

13  November 9, 2020, Plaintiff pled not guilty and challenged the probable cause finding that gave

14  rise to the charges.  (*Id.* at 31, 34–37.)  He cited the statements from officers who noted his

15  "motorcycle did not collide with anything of significant size" and that his motorcycle had fallen

16  "west of the scene" after Plaintiff had driven past the wreckage.  (*Id.* at 35–36.)  Plaintiff

17  appeared before the court virtually on November 12, 2020; the court stated probable cause had

18  been found and directed Plaintiff to remain out of custody subject to various conditions.  (*Id.* at

19  56–57.)

20      On December 1, 2021, Plaintiff filed a motion seeking to dismiss the charges for

21  vehicular homicide premised on driving under the influence.[7]  (*Id.* at 62.)  In his motion, Plaintiff

22

23  ─────────────────────────
    [7] In Washington, a defendant's pretrial motion to dismiss a charge and challenge the state's
    ability to prove all the elements of a crime is often referred to as a *Knapstad* motion, in reference

24

1  again challenged the probable cause finding and noted the error in Officer Block's statement.

2  (*Id.* at 64–65.)  Plaintiff argued that he could not have proximately caused the collision because

3  he did not collide with either Unell's or Stevens's vehicles.  (*Id.* at 66–68.)  The State opposed

4  Plaintiff's motion.  (*Id.* at 75.)  The court held a hearing on the motion on January 27, 2022.  (*Id.*

5  at 92.)  On February 8, the court denied Plaintiff's motion, emphasizing that no contact between

6  the vehicles is required to find causation under applicable Washington law.[8]  (*Id.* at 127–129.)

7          Plaintiff next sought to exclude the statements he made to police at the scene of the crash,

8  arguing he was subjected to custodial interrogation without receiving his *Miranda* warnings.  (*Id.*

9  at 131–133.)  A hearing on this motion was held on September 9, 2022.  (*Id.* at 135.)  In its

10  findings of fact and conclusions of law, the court found that Plaintiff was not in custody when he

11  spoke to Officers Whalen and Block at the scene following the collision, and therefore, his

12  statements to both were admissible.  (*Id.* at 139–141.)  The court found that Plaintiff was in a

13  "custodial situation" when he spoke with Officer Anaya at the hospital, but Officer Anaya

14  properly gave Plaintiff his *Miranda* warnings prior to speaking with him, so these statements

15  were admissible as well.  (*Id.* at 141–142.)

16          Prior to trial, Plaintiff filed motions in limine and sought to exclude the security footage

17  from Evergreen High School.  (*Id.* at 145.)  He argued that even assuming the motorcyclists seen

18  in the video were him and Stevens, the video evidence was prohibited under Washington

19  Evidence Rule 404(b) because it was introduced to prove propensity—namely, that because

20  Plaintiff was speeding in the video, he must have been speeding at the time of the accident.  (*Id.*

21

22  to *State v. Knapstad*, 729 P.2d 48 (1986).  The court must decide "whether the facts which the
    State relies upon, as a matter of law, establish a prima facie case of guilt."  *Id.* at 54.

23  [8] The state court acknowledged that Plaintiff's "motorcycle did not strike the motorcycle of
24  Mathew [sic] Stevens or the SUV of Renee Unell."  (Dkt. No. 24 at 128.)

1   at 146.)  The court ultimately denied the motion, determining that the video was not character

2   evidence, but instead "a link in the chain of an unbroken sequence of events surrounding the

3   charged offense.  It completes the story/provides context for events close in time and place to the

4   charged crime."  (*Id.* at 150.)

### E.  April 2022 Speed Calculation

6          While the parties were engaged in trial preparations, Officer Block attended a motorcycle

7   crash investigation course put on by the Institute of Police Technology and Management that was

8   held in April 2022.  (Dkt. No. 34 at 5.)  Plaintiff's counsel interviewed him a second time on

9   January 19, 2023.  (*Id.* at 4.)  Officer Block explained, after completing the training, he

10  conducted a speed calculation for Plaintiff as of the time Plaintiff's motorcycle laid down on the

11  road and began to slide.  (*Id.* at 6.)  Officer Block determined, based on the first gouge in the

12  roadway, Plaintiff's motorcycle could have been traveling as slow as 47.67 miles per hour.  (*Id.*

13  at 7.)  Officer Block reemphasized that his speed calculation was "strictly from the first point on

14  the ground . . . [t]his has nothing to do with prior to the motorcycle being on its side."  (*Id.* at 9.)

15  Officer Block stated he did not have physical or scientific evidence to determine how fast

16  Plaintiff's motorcycle was traveling prior to the time it began to slide.  (*Id.* at 10; *see also* Dkt.

17  No. 22 at 23.)

### F.  Plaintiff's Criminal Trial

19         Plaintiff's criminal trial began on December 4, 2023.  (Dkt. No. 24 at 152.)  After the

20  State rested, the court dismissed counts one and three (the DUI homicide charges).  (*Id.* at 163.)

21  After a four-day trial, the jury returned a not guilty verdict on both remaining charges (the

22  reckless driving vehicular homicide charges).  (*Id.* at 208, 210.)  The court formally acquitted

23  Plaintiff on December 7.  (*Id.* at 212.)

24

1       **G.  Plaintiff's Federal Lawsuit**

2       Plaintiff initiated this lawsuit on August 3, 2024.  (Dkt. No. 1.)  He amended his

3   complaint on November 21, 2024.  (Dkt. No. 15.)  He alleges three claims under 42 U.S.C.

4   § 1983 for malicious prosecution, judicial deception, and deliberate fabrication of evidence.  (*Id.*

5   at 15–18, 20–21.)  He also alleges state law claims of negligence and outrage.  (*Id.* at 18–20.)  He

6   served his tort claim notice on the City of Vancouver in "February of 2024."  (*Id.* at 15.)

7                        **II        SUMMARY JUDGMENT STANDARD**

8       Summary judgment is proper only if the pleadings, the discovery and disclosure materials

9   on file, and any affidavits show that there is no genuine issue as to any material fact and that the

10  movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party is

11  entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

12  showing on an essential element of a claim in the case on which the nonmoving party has the

13  burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

14  of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

15  for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

16  (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

17  metaphysical doubt.").  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a

18  material fact exists if there is sufficient evidence supporting the claimed factual dispute,

19  requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty

20  Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*,

21  809 F.2d 626, 630 (9th Cir. 1987).

22      The determination of the existence of a material fact is often a close question.  The court

23  must consider the substantive evidentiary burden that the nonmoving party must meet at trial—in

24

1    most civil cases, a preponderance of the evidence. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv.*

2    *Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the

3    nonmoving party only when the facts specifically attested by that party contradict facts

4    specifically attested by the moving party. The nonmoving party may not merely state that it will

5    discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

6    to support the claim. *T.W. Elec. Serv. Inc.*, 809 F.2d at 630 (relying on *Anderson*). Conclusory,

7    non-specific statements in affidavits are not sufficient, and "missing facts" will not be

8    "presumed." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888–889 (1990).

### III    DISCUSSION

**A.  Nature of the Allegations and Parties' Arguments**

11           In many ways, this case boils down to whether one statement in Officer Block's probable

12   cause affidavit corrupted the entire criminal case against Plaintiff (Plaintiff's argument) or

13   whether there was sufficient probable cause to advance charges against Plaintiff, notwithstanding

14   the one statement at issue (Defendant's argument). In their motion for summary judgment,

15   Defendants argue none of Plaintiff's claims should survive. According to Defendants, Plaintiff

16   has not made a "substantial showing of a deliberate falsehood or reckless disregard" in the

17   probable cause affidavit, and that probable cause to arrest Plaintiff existed independently of

18   Officer Block's error. (Dkt. No. 21 at 14–15, 19–22.) They further assert there is no need to

19   determine whether probable cause existed because Plaintiff is collaterally estopped from

20   disputing probable cause in the first place. (*Id.* at 15–19.) Defendants add that Officer Block is

21   entitled to qualified immunity because there is no clearly established law holding that an officer

22   violated the Fourth Amendment under similar circumstances. (*Id.* at 22–24.)

1         As to the third claim under § 1983 for fabrication of evidence, Defendants point to the

2   circuit split on the issue of whether a deliberate fabrication of evidence claim necessarily fails if

3   the plaintiff is acquitted.  (*Id.* at 24.)  For similar reasons to the other § 1983 claims, Defendants

4   argue Officer Block is entitled to qualified immunity because there is no clearly established right

5   at issue.  (*Id.* at 25.)

6         Defendants also point to an "independent reason" to reject Plaintiff's claims.  (*Id.* at 26.)

7   They argue there is a presumption of "prosecutorial independence" that insulates Officer Block

8   from liability because Plaintiff has not provided evidence that Officer Block improperly exerted

9   pressure on the prosecutor or engaged in other misconduct to cause the initiation of criminal

10  proceedings.  (*Id.* at 26–27.)

11        Finally, Defendants argue the negligence claim cannot survive because Washington does

12  not recognize a duty of care in police investigations (outside the child abuse context) or in

13  preparation of a probable cause affidavit.  (*Id.* at 27.)  Defendants conclude that regardless of

14  whether Plaintiff could meet the elements of negligence, the claim is barred by the statute of

15  limitations because he did not file this lawsuit within three years of when the harm accrued.  (*Id.*

16  at 28.)

17        Plaintiff's response to the motion frames the error in the probable cause affidavit as the

18  "sole foundation" for the search warrant and felony charges.  (Dkt. No. 32 at 3.)  In addressing

19  Defendants' collateral estoppel argument, Plaintiff asserts that denial of a *Knapstad* motion is an

20  interlocutory ruling and not a final merits determination; he claims the actual final judgment was

21  the acquittal.  (*Id.* at 29.)  He further argues that the "uniquely deferential standard" of a

22  *Knapstad* motion—where all facts and inferences are viewed in the State's favor—prevents

23  Defendants from applying estoppel in this federal lawsuit.  (*Id.*)

24

As to the § 1983 claims, Plaintiff argues there was no probable cause from the outset.  In support of his judicial deception claim, Plaintiff asserts there is "ample" common sense evidence that Officer Block deliberately or recklessly misled the trial court by including the error in the affidavit and omitting "exculpatory context."  (*Id.* at 22.)  Plaintiff additionally argues a lack of probable cause is established when criminal charges are resolved in favor of the accused; therefore, because Plaintiff was acquitted, there was no probable cause underlying his charges in the first place.  (*Id.* at 23–24.)  Plaintiff again challenges the causation element of the vehicular homicide charges, arguing that there was no "proximate causal link" between Plaintiff and the fatal collision.  (*Id.* at 24–27.)  Further, Plaintiff argues there is no requirement that a plaintiff be convicted in order to assert a fabrication of evidence claim and asserts fabrication of evidence is a clearly established violation. (*Id.* at 18–20.)

Plaintiff also asserts there is no presumption of prosecutorial independence in this case because Defendants did not provide evidence of prosecutorial review of anything besides the erroneous probable cause affidavit.  (*Id.* at 16–17.)

In support of his negligence claim, Plaintiff argues Washington imposes a duty of care on all law enforcement actions, inclusive of preparing probable cause statements.  (*Id.* at 31.)  He asserts that under the doctrine of equitable tolling and the continuing tort doctrine, he is permitted to bring his state law claims because they are based on the same facts as the federal claim not subject to the limitations period, and because he was subject to the harm imposed by the false affidavit until he day he was acquitted.  (*Id.* at 32–34.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**B. Analysis**

    **1. Issue Preclusion**

The Court begins by analyzing whether the initial probable cause determination in Plaintiff's state court criminal case has preclusive effect on his ability to challenge probable cause in this lawsuit.[9]  Issue preclusion, also known as collateral estoppel, "bars relitigation, even in an action on a different claim, of all 'issues of fact or law that were actually litigated and necessarily decided' in the prior proceeding."  *Americana Fabrics, Inc. v. L & L Textiles, Inc.*, 754 F.2d 1524, 1529 (9th Cir. 1985) (quoting *Segal v. Am. Tel. & Tel. Co.,* 606 F.2d 842, 845 (9th Cir.1979)).  "A federal court applying issue preclusion 'must give state court judgments the preclusive effect that those judgments would enjoy under the law of the state in which the judgment was rendered.'"  *Pike v. Hester*, 891 F.3d 1131, 1138 (9th Cir. 2018) (quoting *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 993 (9th Cir. 2001)).

Under Washington law, the party asserting collateral estoppel must prove (1) the issue decided in the prior adjudication is identical to the one presented in the second action; (2) the prior adjudication must have resulted in a final judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior

---

[9] Defendants argue the state court's denial of Plaintiff's *Knapstad* motion precludes him from litigating probable cause in federal court.  (Dkt. No. 21 at 17.)  According to Defendants, this is because the state court's conclusion that the government has sufficient evidence to overcome the motion "necessarily resolves the less stringent issue of whether the State had probable cause to believe in a suspect's guilt."  (*Id.* at 18.)  The Court is unconvinced by this argument.  Probable cause is determined temporally much earlier than a *Knapstad* motion, and is separate and distinct from the *Knapstad* standard, which is a summary-judgment-like standard with all evidence construed in the light most favorable to the State.  *Knapstad*, 729 P.2d at 54.  Moreover, presumably more evidence than that contained in the two-page affidavit of probable cause was presented to support/oppose the *Knapstad* motion.  Without reaching the question of whether the denial of a *Knapstad* motion means probable cause "exists as a matter of law" (*see* Dkt. No. 21 at 17), the court analyzes collateral estoppel as it relates to the state court's initial probable cause finding—before Plaintiff filed his *Knapstad* motion.

adjudication; and (4) precluding litigation of the issue will not work an injustice on the party

against whom collateral estoppel is applied. *Spencer v. Peters*, No. C11–5424 BHS, 2012 WL

4514417, at *10 (W.D. Wash. Oct. 2, 2012) (citing *State v. Harrison*, 61 P.3d 1104, 1109 (Wash.

2003) (en banc)).  Here, Plaintiff is only precluded from litigating the issue of probable cause in

federal court if all four requirements are met.

      The Ninth Circuit has held that in general, when an individual has the opportunity to

challenge a probable cause determination in a prior state court proceeding, they may be barred

from relitigating the issue in a subsequent § 1983 action.  *Awabdy v. City of Adelanto*, 368 F.3d

1062, 1068 (9th Cir. 2004) (citation omitted).  However, collateral estoppel will not bar

relitigation if the probable cause determination is made "on the basis of fabricated evidence

presented at the preliminary hearing or as the result of other wrongful conduct by state or local

officials." *Id.* (citation omitted); *see also id.* at 1067 (holding that a plaintiff is not prevented

from maintaining a § 1983 malicious prosecution claim following a preliminary hearing if the

plaintiff can prove the allegations in their complaint that the criminal proceedings were "initiated

on the basis of the defendants' intentional and knowingly false accusations and other malicious

conduct"); *Fontana v. City of Auburn*, No. C13–0245–JCC, 2014 WL 4162528, at *7 (W.D.

Wash. Aug. 21, 2014) (holding that a probable cause determination made at a preliminary

hearing is "sufficiently firm" to satisfy the requirements of the "final judgment" collateral

estoppel argument).[10]  This is because the "identity of issues" element cannot be met if the

"evidence available and known to the arresting officers is different from the evidence presented

---

[10] In *Fontana*, the court held the elements of collateral estoppel applied and the plaintiff was
barred from challenging the probable cause finding, even though the plaintiff had alleged false
arrest and malicious prosecution claims.  2014 WL 4162528, at *7.  However, the court did not
provide sufficient analysis of how it arrived at this conclusion, nor how this case is distinct from
the Ninth Circuit's holdings in *Awabdy* and *Wige*.

1    to the court." *Wige v. City of L.A.*, 713 F.3d 1183, 1186 (9th Cir. 2013). A plaintiff who can

2    establish that an officer lied or fabricated evidence may relitigate the issue of probable cause

3    "with the falsified evidence removed from the equation." *Id.*

4          The Court assumes based on the record there was a probable cause determination made at

5    a preliminary hearing in Plaintiff's criminal case. On November 10, 2020, Plaintiff filed a

6    motion to reconsider probable cause based on exculpatory evidence. (Dkt. No. 24 at 34.) In his

7    motion, Plaintiff argued there was no probable cause because he was not physically involved in

8    the accident and instead slid past the collision site as he tried to avoid debris from both vehicles.

9    (*Id.* at 35–36.) On November 12, Plaintiff made his preliminary appearance. (*Id.* at 54.) The

10   conditions of his release were set with an order stating, "THE COURT HAVING found probable

11   cause" and requiring Plaintiff to check in once per month in person and over the phone. (*Id.* at

12   56.)

13         Here, the Court denies issue preclusion because Plaintiff is challenging what was

14   presented to the state court in the probable cause determination as maliciously or fraudulently

15   included. Plaintiff's claims for malicious prosecution and judicial deception are premised on his

16   allegation that Officer Block included the phrase, "the first motorcycle collided with the BMW at

17   the driver's door and the second motorcycle collided with both vehicles." (Dkt. No. 15 at 13–

18   15.) According to Plaintiff, this statement is a "deliberate falsehood," and its inclusion in the

19   probable cause affidavit demonstrates a reckless disregard for the truth. (*Id.* at 16–17.) Plaintiff

20   argues the felony charges were only filed against him "on the strength of Officer Block's false

21   probable cause statement." (Dkt. No. 32 at 9.) As the Ninth Circuit has observed, "[t]hat the

22   court found probable cause based on the set of facts presented at the preliminary hearing

23   obviously does not resolve whether the officers had probable cause based on the true set of facts

24

known to them." *Wige*, 713 F.3d at 1186; *see also Scafidi v. Las Vegas Metro. Police Dep't*, 966 F.3d 960, 964 (9th Cir. 2020) (reversing the district court's finding of issue preclusion on a probable cause challenge when the plaintiff contended the police defendants "misrepresented the results of the alleged victim's sexual assault exam on a warrant affidavit" and made allegations of fabricated evidence or other "wrongful conduct undertaken in bad faith"). Here, whether Officer Block fabricated evidence or maliciously included it in the probable cause affidavit presented to the state court is the key issue for most of Plaintiff's case. The Court therefore concludes issue preclusion does not apply, and Plaintiff may relitigate the issue of probable cause with the allegedly false evidence "removed from the equation." *Wige*, 713 F.3d at 1186.

### 2. Malicious Prosecution Under State Law and § 1983, and Judicial Deception Under § 1983

For malicious prosecution claims brought under § 1983, federal courts look to state law. *Mills v. City of Covina*, 921 F.3d 1161, 1169 (9th Cir. 2019); *Awabdy*, 368 F.3d at 1066. In Washington, a malicious prosecution claim requires the plaintiff to prove: "(1) the defendant instituted or maintained the alleged malicious prosecution; (2) lack of probable cause to institute or continue the prosecution; (3) malice; (4) the proceedings ended on the merits in favor of the plaintiff or were abandoned; and (5) the plaintiff suffered injury or damage as a result." *Alvarez v. King Cnty.*, No. C06-0023-JCC, 2006 WL 3692623, at *1 (W.D. Wash. Dec. 12, 2006) (quoting *Hanson v. Estell*, 997 P.2d 426, 430 (Wash. Ct. App. 2000)). To maintain a § 1983 action for malicious prosecution, the plaintiff must show "the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Awabdy*, 368 F.3d at 1066 (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)). Under both federal and state law,

probable cause is an "absolute defense" to malicious prosecution. *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054–1055 (9th Cir. 2009); *Clark v. Baines*, 84 P.3d 245, 249 (Wash. 2004).

The standard for judicial deception also relies on a finding of probable cause. Plaintiff must (1) "make a substantial showing of [the officers'] deliberate falsehood or reckless disregard for the truth" and (2) "establish that, but for the dishonesty, the [searches and arrest] would not have occurred." *Chism v. Washington State*, 661 F.3d 380, 386 (9th Cir. 2011) (quoting *Liston v. Cnty. of Riverside,* 120 F.3d 965, 973 (9th Cir. 1997)). As to the first element, Plaintiff must make the "substantial showing" to put the issue to a trier of fact, but that is less than "clear proof." *Id.* at 387. The second element requires Plaintiff to establish that "the false statements and omissions were material to the magistrate judge's probable cause determination." *Id.* at 388–389. The standard for judicial deception overlaps with the standard for "deliberate or reckless omission" for suppression under *Franks v. Delaware,* 438 U.S. 154 (1978). *Id.* at 392; *see also Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995), *as amended on denial of reh'g* (Dec. 5, 1995) ("The showing necessary to get to a jury in a section 1983 action is the same as the showing necessary to get an evidentiary hearing under *Franks.*"). The Court finds Plaintiff has failed to make a showing.

### a. Plaintiff has not made a showing of deliberate falsehood or reckless disregard for the truth

Plaintiff has not made a substantial showing as to the first element of his judicial deception claim. He argues there are three bases for finding Officer Block deliberately or recklessly included false information in the probable cause affidavit: (1) Officer Block wrote that Plaintiff "collided with both vehicles," yet it is undisputed he meant to write "*parts* from both vehicles" (emphasis added); (2) Officer Block stated Plaintiff was traveling at a "high rate of speed" and omitted other exculpatory details, which created a "false impression of reckless

1   proximity and direct involvement"; and (3) Defendants' "concession[]" that the statement was a

2   mistake "confirms the centrality of the falsehood and Block's reckless disregard." (Dkt. No. 32

3   at 22–23.)

4        In the Court's view, the most significant issue with the probable cause affidavit is Officer

5   Block's mistaken description of the collision scene. In his probable cause affidavit, Officer

6   Block wrote: "[t]he first motorcycle collided with the BMW at the driver's side door, and the

7   second motorcycle collided with both vehicles," when he should have written that the second

8   motorcycle collided with "*parts* from both vehicles." (Dkt. No. 24 at 24) (emphasis added).

9   This information was known to Officer Block when he drafted the probable cause affidavit

10  roughly a year after the collision. (*See id.* at 25.) However, Defendants do not dispute this

11  omission was inadvertent. In his interview with Plaintiff's defense counsel, Officer Block

12  acknowledged the word "parts" was missing and said, "[i]t should be parts of both vehicles

13  . . . it's meant to be like that scattering of parts, not the main vehicle itself." (*Id.* at 13.) The

14  formal investigative report—prepared one day before the probable cause statement—includes a

15  much more comprehensive description of the collision scene, the accident itself, and the

16  aftermath, as well as photos and references to other officers' reports; it does not include the error.

17  (Dkt. No. 22 at 8–15.) Officer Block's omission in drafting the probable cause statement was

18  arguably negligent, but the record does not support Plaintiff's inference that the omission

19  rendered the affidavit deliberately false or showed a reckless disregard for the truth. And the

20  Court agrees with Defendants that either way, removing or correcting the erroneous statement

21  would make no difference to the probable cause determination.

22        The same is true of Plaintiff's characterization of Officer Block's assertion that the

23  motorcycles were traveling at a "high rate of speed." (Dkt. No. 24 at 24.) Plaintiff ignores much

24

of the evidence in the record that indicates speed was indeed a factor and focuses on Officer

Block's "exculpatory" speed calculation from late 2022 that indicated Plaintiff might have been

going 47–52 miles per hour when his motorcycle began to slide on the pavement.  (*See* Dkt. Nos.

22 at 23–24; 34 at 5–10.)  As discussed in more detail *infra*, Officer Block conducted the speed

calculation more than two years after he drafted the probable cause statement and it was

therefore impossible to include in the affidavit prepared in July 2020.  (Dkt. Nos. 22 at 23–24; 34

at 4–6.)  And in any case, Officer Block's inference from the evidence that Plaintiff and Stevens

were speeding is not an unreasonable one.  He himself observed "significant damage" to Unell's

BMW, including two shattered windows, a buckled roof, and deployed airbags. (Dkt. No. 24 at

44.)  He also observed the "catastrophic damage" to Stevens's motorcycle.  (*Id.*)  It "broke apart

into pieces," with "numerous additional parts and pieces" scattered around the collision scene,

and the pieces that could be identified were "severely mangled."  (*Id.*)  Stevens's body was found

in a supine position in the roadway.  (*Id.*)  Plaintiff argues that Officer Block omitted that

Plaintiff "merely rode over debris, fell, and slid" (Dkt. No. 32 at 22), but Officer Block did

include in his report that Plaintiff's motorcycle was damaged only from "laying the motorcycle

on its side and sliding along the roadway," evidenced by "two distinct grooved scratches in the

road." (Dkt. No. 24 at 45.)  Plaintiff puts forth no contrary evidence or case law to support his

argument that any of these details were included or omitted to "create a false impression of

reckless proximity and direct involvement" in the collision.  (Dkt. No. 32 at 22.)

     Finally, Plaintiff makes a conclusory assumption that the admission of the mistake

"confirms . . . Block's reckless disregard," but this assumption is not supported by any evidence

in the record.  (*Id.* at 23.)  That Officer Block affirmed, when asked directly, that he had

accidentally omitted the word "parts" from his description of the collision does not suggest he

1   recklessly or deliberately made the omission.  (Dkt. No. 24 at 13–14; *see also* Dkt. No. 33-3 at

2   4.)  Rewriting the section of the probable cause statement to correctly state that Plaintiff collided

3   with *parts* from both vehicles would have provided additional context but would not have been

4   outcome-determinative for finding probable cause.

### b.  There was probable cause to arrest Plaintiff

6       "Probable cause 'is not a high bar.'"  *D.C. v. Wesby*, 583 U.S. 48, 57 (2018) (quoting

7   *Kaley v. United States*, 571 U.S. 320, 338 (2014)).  It "requires only a probability or substantial

8   chance of criminal activity, not an actual showing of such activity."  *Id.* (quoting *Illinois v.*

9   *Gates*, 462 U.S. 213, 233–234, n.13 (1983)).  Probable cause "must be determined at the time the

10  arrest is made."  *Allen v. City of Portland*, 73 F.3d 232, 236 (9th Cir. 1995).  It is a "totality of

11  the circumstances" test, from the perspective of a "'reasonably objective police officer.'"  *Wesby*,

12  583 U.S. at 57 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).  This standard was

13  satisfied here.

14      The elements of vehicular homicide in the State of Washington are (1) the death of any

15  person, (2) caused by the driving of any vehicle by any person if (3) the driver was operating a

16  motor vehicle (4) while under the influence or in a reckless manner or with disregard for the

17  safety of others.  Wash. Rev. Code § 46.61.520.  Active participation in the "immediate physical

18  impetus of harm" is not required in crimes of criminal negligence, such as vehicular homicide.[11]

19  *State v. Frahm*, 444 P.3d 595, 599 (Wash. 2019) (upholding conviction for vehicular homicide

20  when the defendant struck a vehicle that was not the decedent's and fled the scene, because these

21

22  [11] A defendant acts with criminal negligence "when he or she fails to be aware of a substantial
    risk that a wrongful act may occur and his or her failure to be aware of such substantial risk
23  constitutes a gross deviation from the standard of care that a reasonable person would exercise in
    the same situation."  *State v. Frahm*, 444 P.3d 595, 599 (Wash. 2019) (citing Wash. Rev. Code
24  § 9A.08.010(l)(d)).

1   acts "directly caused harm in and of themselves").  Proximate cause can be found even if the

2   defendant's vehicle is not physically involved in the accident.  *See State v. Parker*, 806 P.2d

3   1241, 1245 (Wash. Ct. App. 1991).  Here, based on a totality of the circumstances, the affidavit

4   of probable cause lays out the basic elements of vehicular homicide even if the offending

5   statement is excised.

6          To recap the key, undisputed facts of this case: On the night of July 26, 2019, Vancouver

7   police officers responded to a motor vehicle collision between a motorcycle and a passenger

8   vehicle.  The motorcycle broke apart into pieces, the passenger vehicle was mangled, debris from

9   the vehicles was scattered along the road, and both drivers died at the scene.  Plaintiff and the

10  green motorcycle he had been riding were found near the wreckage.  When asked about the

11  events leading up to the accident, Plaintiff described driving into an explosion of parts in front of

12  him; he avoided what he could but was forced to fall to the side of his motorcycle and slide past

13  the collision.  Plaintiff told Officer Block he had been drinking beer at some point prior to the

14  accident; later testing confirmed he had alcohol in his system.  Another officer and other

15  witnesses reported seeing two motorcycles—one of them green—driving at high speeds on NE

16  18th Street around five minutes before the collision.  Taken together, the evidence is more than

17  enough to create a "probability or substantial chance of criminal activity" and establish probable

18  cause to arrest Plaintiff.  *Wesby*, 583 U.S. at 57.

19         That remains true even when the probable cause finding is examined without the error in

20  the affidavit.  Plaintiff argues the false statement that his motorcycle "collided with both

21  vehicles" is so central to the probable cause finding that without that statement, the entire

22  affidavit would fall apart.  (*See* Dkt. No. 32 at 12, 22–23.)  But that is contrary to the evidence in

23  the record.  All responding officers noted the significant damage done to Unell's BMW and

24

Stevens's motorcycle in their incident reports.  (*See* Dkt. Nos. 25 at 4 (describing the "totally

destroyed motorcycle" and "heavy damage" to the BMW); 27 at 4 (stating the light-colored

motorcycle was "nearly in pieces"); 28 at 4 (observing the "hundreds of small plastic, metal, and

glass parts" throughout the scene and that the "driver's door and B pillar" had been forced into

Unell's body on impact).)  By contrast, hardly anyone made specific observations about the state

of Plaintiff's motorcycle, other than the fact it was green and laying in the road west of the

collision site.  (Dkt. Nos. 25 at 4; 27 at 4.)  Officer Block described the "minimal damage" to

Plaintiff's motorcycle and noted it "appeared that this motorcycle did not collide with anything

of significant size."  (Dkt. No. 24 at 45.)  He further observed the damage was from "sliding

along the roadway" and clarified there was some damage to the motorcycle which was

"obviously from before this collision."  (*Id.*)  Plaintiff himself undisputedly described the

moment of the accident as "'an explosion of parts.'"  (*Id.* at 46.)  Further, several officers

observed Plaintiff smelled of alcohol when he was speaking with Officer Block.  (Dkt. Nos. 24 at

45; 26 at 4; 27 at 5.)  These observations were corroborated by a PBT conducted by Officer

Block and a blood toxicology test conducted at the hospital, which both indicated Plaintiff had

alcohol in his system at the time of the collision.  (Dkt. Nos. 24 at 47; 30 at 4; 22 at 22.)  Officer

Calhoun witnessed two motorcycles, one of them green, traveling at speeds he predicted to be

over 100 miles per hour minutes before the collision occurred.  (Dkt. No. 25 at 4.)  A witness

told the police he heard two motorcycles racing up and down NE 18th Street prior to the

collision.  (Dkt. No. 27 at 4.)  The police did not identify any other motorcyclists in the area

other than Stevens and Plaintiff.  (Dkt. No. 22 at 4–5.)

The key evidence identified above was summarized in the probable cause affidavit:

- "I found a silver BMW X5 . . . stopped in the roadway.  There was also a motorcycle on the roadway.  This motorcycle was unrecognizable due to its damage."

- "A second motorcycle . . . was found about 150 feet west of the collision scene laying on its side in the roadway."

-  "[Plaintiff] admitted to drinking beer with the deceased motorcycle driver . . . throughout the day. . . I could smell the odor of an alcoholic beverage emitting from his breath.  I could also see [Plaintiff]'s eyes appeared to be bloodshot and watery."

- "I spoke with witnesses who reported that the two motorcycles had been racing back and forth on NE 18th Street.  They reported the motorcycles had been driving at high speeds in each direction several times."

- "[Plaintiff] estimated his speed at about 60 mph in this marked 40 mph zone. [Plaintiff] stated that Matthew was driving 'a lot faster' than he was.  I asked [Plaintiff] if he was racing Matthew and [Plaintiff] replied 'well, we were probably speeding but we were not racing each other.'"

(Dkt. No. 24 at 24.)

Looking at these key facts, which were supported by the investigation, a reasonably objective officer could conclude based on the totality of the circumstances that Plaintiff and Stevens had been drinking, were speeding or racing in the area around NE 18th Street prior to the collision, and that after witnessing the collision directly in front of him, Plaintiff attempted to avoid the debris, laid down his motorcycle on the pavement, and slid past the collision site to where he was found by officers when they responded to the accident.  Taken together, this

1   information presents a probability or substantial chance that Plaintiff, by racing with Stevens,

2   was a proximate cause of the collision that resulted in the death of a person while Plaintiff was

3   operating a motor vehicle under the influence, or in a reckless manner, or with disregard for the

4   safety of others.  The fact that Plaintiff's motorcycle was not physically involved in the collision

5   does not alter the probable cause analysis.  *See Parker*, 806 P.2d at 1245 (Parker's "excessive

6   speed was a proximate cause of [the co-defendant]'s speeding which in turn was a proximate

7   cause of the death and injury").  This is true without any mention of the disputed statement in the

8   probable cause affidavit.[12]

9         The Court is also not persuaded by Plaintiff's attempts to use a post-hoc speed calculation

10  to challenge the probable cause finding.  Plaintiff argues Officer Block maliciously included the

11  claim that Plaintiff was "traveling at a high rate of speed" in his probable cause affidavit, despite

12  knowing that Plaintiff was traveling 47–52 miles per hour and was "potentially a quarter-mile

13  distant." (Dkt. No. 32 at 22.)  However, probable cause is measured from the time the officer

14  makes the challenged law enforcement action, *Allen*, 73 F.3d at 236, and the evidence shows

15  Officer Block did not conduct this speed calculation until late 2022—over two years after

16  drafting his probable cause statement.[13]  (Dkt. Nos. 22 at 23–24; 34 at 4–9.)  Further, the theory

17  that Plaintiff could have been a quarter of a mile behind Stevens at the time of the collision was

18

19  [12] This conclusion is supported by the state court's assessment of the matter.  Plaintiff challenged the probable cause finding for the first time in November 2020 when he pointed out the collision

20  reports showed he did not collide with either vehicle.  (*See* Dkt. No. 24 at 34–37.)  Despite Plaintiff raising this issue, the court still found probable cause and the case moved forward.  (*Id.*

21  at 56.)

22  [13] Even if the speed calculation was contemporaneous, it would still be of limited value because Plaintiff's speed was calculated as of the time his motorcycle hit the ground and began to slide.

23  (Dkt. No. 34 at 8–9, 14.)  There is no evidence in the record that suggests definitively how fast Plaintiff was traveling prior to the motorcycle hitting the ground, or whether he decelerated, or

24  how long it took.  In any event, this inquiry is speculative and ultimately unnecessary, because the Court finds there was probable cause even without the addition of the speed calculation.

1    first raised by *Plaintiff* when he was speaking with Officer Anaya at the hospital following the

2    accident.  (*See* Dkt. No. 30 at 4) ("[Plaintiff] stated he was not racing with Matthew Stevens and

3    claimed he was more than a quarter mile behind him when the collision occurred").  Later,

4    during Plaintiff's criminal trial, Officer Block acknowledged during cross examination that it

5    was "possible" Plaintiff was a quarter mile behind when Stevens and Unell collided.  (Dkt. No.

6    33-7 at 14–15.)  But whether Officer Block, speaking on the stand in December 2023, thought it

7    was possible Plaintiff may have been going slower or was more distant has no bearing on

8    whether he contemplated that possibility when he made the probable cause determination in July

9    2020—and there is no evidence in the record to indicate he did.  At that time, Officer Block

10   knew only that (1) Plaintiff predicted he was traveling around 60 miles per hour prior to the

11   collision (Dkt. No. 24 at 24); (2) Officer Calhoun reported seeing two motorcyclists racing past

12   him on NE 18th Street at "easily 100+ MPH" minutes before the collision (Dkt. No. 25 at 4); (3)

13   a witness heard two motorcycles racing up and down NE 18th Street prior to the collision (Dkt.

14   No. 24 at 24); (4) Plaintiff described what he saw as an "explosion of parts" in front of him (*Id.*

15   at 46); and (5) surveillance footage from nearby Evergreen High School showed two

16   motorcyclists speeding on NE 18th Street around the same timeframe as Officer Calhoun's

17   report (Dkt. No. 22 at 12–13).  Officer Block also had firsthand knowledge of the collision scene

18   and observed the significant damage to the parties' vehicles.  (Dkt. Nos. 22 at 9; 24 at 24.)  Even

19   if the post-hoc speed calculation was included, it would not negate the existence of probable

20   cause at the time of the affidavit.  Based on his observations and the information available to him

21   at the time, Officer Block had enough information to conclude that Plaintiff was indeed traveling

22   at a "high rate of speed" prior to the accident.

23

24

1    In sum, while Plaintiff is critical of the probable cause affidavit, none of the statements or

2    omissions he asserts rise to the level of deliberate falsehood or reckless disregard for the truth.

3    The Court's finding of probable cause is fatal to Plaintiff's claims of malicious prosecution and

4    judicial deception.

### 3. Fabrication of Evidence

6    To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove the

7    defendant official deliberately fabricated evidence, and that the deliberate fabrication caused the

8    plaintiff's deprivation of liberty. *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). The

9    plaintiff must "first point to evidence [they] contend[] the government deliberately fabricated."

10   *Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015). The plaintiff can then prove the

11   fabrication was deliberate by producing "direct evidence of deliberate fabrication" or

12   "circumstantial evidence related to a defendant's motive." *Caldwell v. City & Cnty. of S.F.*, 889

13   F.3d 1105, 1112 (9th Cir. 2018). But not all "inaccuracies in an investigative report give rise to a

14   constitutional claim," and mere carelessness, mistakes of tone, and trivial errors are insufficient

15   to establish causation. *Spencer*, 857 F.3d at 798. Withholding exculpatory evidence likewise

16   does not give rise to a deliberate fabrication of evidence claim. *Devereaux v. Abbey*, 263 F.3d

17   1070, 1079 (9th Cir. 2001) (en banc).

18   Plaintiff argues Officer Block's statement that Plaintiff "collided with both vehicles," and

19   his subsequent admission that that statement was false, established "deliberate, repeated

20   misrepresentations" that triggered liberty restrictions. (Dkt. No. 32 at 20.) But the record

21   indicates that Officer Block's misstatement, at most, was a careless error, and Plaintiff provides

22   no evidence to the contrary. To prevail on a deliberate fabrication of evidence claim, Plaintiff

23   must show more than mere errors and carelessness. *See Gausvik v. Perez*, 345 F.3d 813, 817

24

1    (9th Cir. 2003) (holding that a careless or inaccurate affidavit did not amount to deliberate

2    fabrication). Plaintiff has not made such a showing.

3           Nor does Plaintiff produce circumstantial evidence of deliberate fabrication.  To prevail,

4    Plaintiff must point to evidence that supports at least one of the following two propositions: "(1)

5    Defendants continued their investigation of Plaintiff despite the fact that they knew or should

6    have known that he was innocent; or (2) Defendants used investigative techniques that were so

7    coercive and abusive that they knew or should have known that those techniques would yield

8    false information." *Devereaux*, 263 F.3d at 1076.  The evidence in the record does not establish

9    that Officer Block had reason to know of Plaintiff's innocence.  Rather, the evidence appears to

10   show that Officer Block was aware Plaintiff did not hit Unell's or Stevens's vehicles but

11   believed there was sufficient evidentiary support to recommend charges of vehicular homicide

12   anyway.  (*See generally* Dkt. No. 22 at 9–10, 14–15.)  And the fact that Plaintiff was

13   subsequently acquitted does not mean that at the time Officer Block made his recommendation to

14   the prosecutor, he knew Plaintiff was innocent.  As for the second prong, Plaintiff has not offered

15   any evidence to support an inference that Officer Block used coercive and abusive investigative

16   techniques during his interactions with Plaintiff.  In his complaint, Plaintiff gestures vaguely at

17   "techniques that were so coercive and abusive that [Officer Block] knew, or was deliberately

18   indifferent, that those techniques would yield false information that was used to criminal charge

19   and prosecute" Plaintiff.  (Dkt. No. 15 at 20.)  But that allegation is unsupported by evidence and

20   is insufficient at the summary judgment phase.

21          **4.  Defendants' Immunity Arguments**

22          Although no evidence presented in this case has led the Court to a different conclusion on

23   the probable cause finding than the conclusion reached by the state court, the Court briefly

24

comments on Officer Block's argument that he is entitled to qualified immunity.[14]  Defendants

argue Officer Block is immune because in a Fourth Amendment case, officers are granted

qualified immunity "'unless all reasonable officers would agree there was no probable cause *in

this instance*.'"  (Dkt. No. 21 at 23) (emphasis in original) (quoting *Johnson v. Barr*, 79 F.4th

996, 1005 (9th Cir. 2023) (citation omitted).  Defendants argue Plaintiff cannot meet this burden

because there is no precedent that demonstrates the evidence here falls short of probable cause,

independent of Officer Block's misstatement.  (*Id.* at 24.)  Plaintiff responds that qualified

immunity does not protect an officer who knowingly includes false statements or omits

exculpatory facts that negate probable cause.  (Dkt. No. 32 at 21) (citing *Hervey*, 65 F.3d at 788–

789).  Defendants reply that "Fourth Amendment claims demands specificity," and emphasize

Plaintiff's failure to cite to precedent demonstrating that a "lone misstatement" is material to a

probable cause finding.  (Dkt. No. 35 at 10.)

   The qualified immunity analysis for malicious prosecution and judicial deception boils

down to the merits discussion of those claims.  The Ninth Circuit explained in *Chism* that

qualified immunity is not available where there has been a finding of judicial deception because:

> if an officer submitted an affidavit that contained statements he knew to be false
> or would have known were false had he not recklessly disregarded the truth and
> no accurate information sufficient to constitute probable cause attended the false
> statements . . . he cannot be said to have acted in a reasonable manner, and the
> shield of qualified immunity is lost.

---

[14] Plaintiff's opposition to Defendants' motion for summary judgment exclusively addresses the
§ 1983 claims as they relate to Officer Block.  (*See* Dkt. No. 32 at 12–13, 18–28.)  Plaintiff cites
no case law and provides no evidence that the City of Vancouver had a longstanding practice or
custom that was the "moving force" behind the alleged constitutional violations, or that it ratified
Officer Block's alleged unconstitutional actions.  *See Gordon v. Cnty. of Orange*, 6 F.4th 961,
973–974 (9th Cir. 2021) (internal citations omitted).  As the Court has noted, because Plaintiff
has not offered opposition to dismissal of his § 1983 claims for municipal liability under *Monell*,
those claims are considered abandoned.

1  661 F.3d at 393 (citation omitted).  Similarly, qualified immunity cannot protect officers from a

2  cognizable claim of malicious prosecution.  *Franklin v. Mally*, Case No. 17-cv-00789-HSG,

3  2019 WL 2548687, at *7 (N.D. Cal. June 20, 2019) ("it is obvious to any reasonable officer that

4  they cannot cite a suspect based on knowingly false information, from which a prosecutor would

5  file charges") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 480–483 (9th Cir. 2007)

6  (reversing summary judgment on malicious prosecution claim and finding that qualified

7  immunity did not apply)).  But here, the Court finds no evidence that Officer Block knowingly

8  provided false information or recklessly disregarded the truth in his probable cause affidavit, and

9  the affidavit contained sufficient evidence to establish probable cause.  Accordingly, there can be

10  no constitutional violation based on either judicial deception or malicious prosecution.

11      The Court could end its analysis there.  *See Pearson v. Callahan*, 555 U.S. 223, 236

12  (2009) (holding that courts have discretion to consider the two prongs of qualified immunity in

13  either order).  At the second step, the reasonableness of Officer Block's actions, the Court agrees

14  with Defendants that even considering Officer Block's acknowledgment of his mistake in the

15  affidavit (*see* Dkt. No. 24 at 13–14), the affidavit was not so clearly invalid that a reasonable

16  officer at the time would have known that probable cause did not exist.  The same goes for the

17  post-hoc speed calculation conducted by Officer Block, which was not available when he made

18  his initial probable cause finding.  (Dkt. Nos. 22 at 23–24; 34 at 5–7.)  Neither after-the-fact

19  addition is sufficient to poke enough holes in the probable cause affidavit to defeat qualified

20  immunity.  *See Lombardi v. City of El Cajon*, 117 F.3d 1117, 1126 (9th Cir. 1997) ("when it is

21  not plain that a neutral magistrate would not have issued the warrant, the shield of qualified

22  immunity should not be lost, because a reasonably well-trained officer would not have known

23  that the misstatement or omission would have any effect on issuing the warrant").  As the Court

24

1    held *supra*, probable cause was established, even if the contested information was added or

2    omitted.

3           As for the fabrication of evidence claim, the parties dedicate much of their briefing on the

4    issue to whether the Ninth Circuit permits a deliberate fabrication claim to be brought if the

5    plaintiff is subsequently acquitted, as Plaintiff was in this case.  (*See* Dkt. Nos. 21 at 24–25; 32 at

6    18–20; 35 at 10–11 (discussing the circuit split and applicable Ninth Circuit case law).)  The fact

7    that the contours of the right are fuzzy would mean Officer Block is likely entitled to qualified

8    immunity.  However, the Court declines to speculate on the circuit split discussion because

9    summary judgment can be granted purely on the lack of evidence in the record that Officer Block

10   deliberately fabricated evidence that gave rise to Plaintiff's criminal charges.[15]

11          **5.  Negligence Claim**

12          Plaintiff cannot prevail on a negligence claim against Officer Block.  In general, a claim

13   for negligent investigation does not exist under Washington common law because it prescribes

14   no duty owed to a particular class of persons.  *Rodriguez v. Perez*, 994 P.2d 874, 877 (Wash. Ct.

15   App. 2000).  "[T]he duty of police officers to investigate crimes is a duty owed to the public at

16   large and is therefore not a proper basis for an individual's negligence claim."  *Id.* (citing

17   *Chambers-Castanes v. King Cnty.*, 669 P.2d 451, 457 (Wash. 1983) (en banc)).  The Washington

18   legislature has carved out a limited exception for child abuse investigations specifically.  *See*

19   *McCarthy v. Cnty. of Clark*, 376 P.3d 1127, 1134 (Wash. Ct. App. 2016) (discussing the

20   statutory duty and implied right of action created by Washington Revised Code § 26.44.050).

21

22

23   _____

     [15] Having found that Plaintiff's constitutional claims fail on the merits, the Court does not reach
     Defendants' argument that Officer Block is shielded from liability on the basis of prosecutorial

24   independence.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 21) - 36

1    Therefore, to the extent Plaintiff bases his negligence claim on Officer Block's investigation, his

2    claim fails.

3            Plaintiff relies on *Mancini v. City of Tacoma*, 479 P.3d 656 (Wash. 2021) (en banc) to

4    support his argument that "Washington imposes a duty of care on all law enforcement actions,

5    including preparing affidavits and probable cause statements." (Dkt. No. 32 at 31.) It does

6    appear that Washington courts have, in some situations, recognized a duty of reasonable care in

7    the context of law enforcement. *See Mancini*, 479 P.3d at 664 (quoting *Beltran-Serrano v. City

8    of Tacoma*, 442 P.3d 608, 614 (Wash. 2019) (en banc)). But it is unclear whether such duty

9    would apply in this case, where Officer Block sought to summarize the results of his

10   investigation in an affidavit of probable cause. Regardless, the Court need not determine if that

11   duty applies here, because even if the Court assumes Officer Block had a general duty of care to

12   Plaintiff in drafting his probable cause affidavit, Plaintiff still cannot establish that Officer

13   Block's allegedly negligent conduct proximately caused his injury.

14           In Washington, proximate cause has two elements: cause in fact and legal causation.

15   *Campanelli v. PeaceHealth Sw. Med. Ctr.*, 565 P.3d 933, 943 (Wash. Ct. App. 2025) (citing

16   *Hartley v. State*, 698 P.2d 77, 82 (Wash. 1985) (en banc)). Cause in fact refers to the actual, "but

17   for" cause of the injury. *Id.* (citation omitted). Legal causation is "grounded in policy

18   determinations as to how far the consequences of a defendant's acts should extend"; the court

19   must look at whether the breach is "too remote or insubstantial to trigger liability." *Id.* (citation

20   omitted).

21           Here, Plaintiff asserts the false statement made by Officer Block "set in motion the legal

22   proceedings" that led to his prosecution. (Dkt. No. 15 at 19.) In other words, Plaintiff argues

23   that but for the false statement he would not have been prosecuted. But as already concluded,

24

probable cause exists even after excising the offending statement from the probable cause affidavit. *See* Section III(B)(2)(b) *supra*. Therefore, as a matter of law, it cannot be concluded that but for the offending statement Plaintiff would have avoided prosecution.[16] *See Meyers v. Ferndale Sch. Dist.*, 457 P.3d 483, 489 (Wash. Ct. App. 2020) (cause in fact is "frequently considered as a chain of events *without which a harm would not have occurred*") (emphasis added). And applying the same reasoning to the legal causation element, because probable cause existed notwithstanding the misstatement, the misstatement was likely too remote or insubstantial to trigger liability. *Campanelli*, 565 P.3d at 943 (citation omitted). Consequently, even if Officer Block had a duty to Plaintiff, he did not proximately cause Plaintiff's alleged injury. Plaintiff's negligence claim fails.[17]

## IV    CONCLUSION

Defendants' motion for summary judgment (Dkt. No. 21) is GRANTED. The trial calendar is stricken, and the Clerk shall close the case and enter judgment.

Dated this 9th day of October 2025.

---

[16] This conclusion is also supported by the trial court's rejection of Plaintiff's arguments. *See* n.12 *supra*.

[17] There are two additional loose ends to tie up related to Plaintiff's negligence claim. First, the Court declines to delve into the various statute of limitations arguments raised by the parties (*see* Dkt. Nos. 21 at 28–29; 32 at 32–34; 35 at 12–13) because Plaintiff's negligence claim fails on the merits. However, the Court observes that Plaintiff's injury may have accrued at the latest on November 9, 2020, when he challenged the probable cause finding in his state criminal proceedings, and thus his negligence claim might be time-barred. (*See* Dkt. No. 24 at 34–37.) Second, the Court notes Plaintiff seeks to amend his complaint to assert a state law malicious prosecution claim. (Dkt. No. 32 at 33–34.) The Court denies this request for three reasons: First, as discussed, Plaintiff's negligence claim fails substantively, rather than on statute of limitations grounds. Next, Plaintiff fails to show good cause to amend his complaint this late in the litigation. And finally, it appears Plaintiff *did* plead a malicious prosecution claim under state law. (*See* Dkt. No. 15 at 15.) This claim was addressed by the Court in Section III(B)(2) *supra*.

1

2

David G. Estudillo
United States District Judge

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24